**AMOCO PRODUCTION COMPANY,**
Plaintiff–Appellant,

v.

**SEA ROBIN PIPELINE COMPANY,**
Defendant–Appellee.

**PENNZOIL PRODUCING COMPANY,**
Plaintiff–Appellant,

v.

**SEA ROBIN PIPELINE COMPANY,**
Defendant–Appellee.

Nos. 86–4916, 86–4917.

United States Court of Appeals,
Fifth Circuit.

May 18, 1988.

held otherwise) any Rule 11 (or section 1927) violations and the appropriate sanctions in respect thereto under *Thomas*.

La., Adrian L. Steel, Jr., William H. Knull, III, Kathryn A. Oberly, H. Bruce Golden, Mayer, Brown & Platt, Houston, Tex., W. DeVier Pierson, James M. Costan, Pierson, Semmes & Finley, Washington, D.C., for defendant-appellee.

John F. Whitney, David R. Richardson, Galen S. Brown, Margaret E. Woodward, Barham & Churchill, New Orleans, La., for plaintiff-appellant, Pennzoil Producing Co.

Before BROWN, POLITZ, and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The underlying dispute in this case concerns take-or-pay obligations in contracts for the sale/purchase of natural gas, made between Sea Robin Pipeline Co. (Sea Robin) as purchaser, and Amoco Production Co. (Amoco) as seller. But it soon becomes a question of federal jurisdiction. Sea Robin notified Amoco that, due to several circumstances beyond its control, Sea Robin considered that a "general condition of force majeure" existed which excused Sea Robin's "full performance" of obligations under the contracts for the purchase of natural gas from Amoco. Amoco disputed this. Sea Robin continued to purchase gas under extant contracts, but in quantities less than the quantities contemplated by those contracts and without making payments pursuant to the take-or-pay provisions. Amoco filed suit against Sea Robin in the courts of Louisiana. Sea Robin then removed[1] that action to United States District Court, asserting that federal question jurisdiction existed[2] under the Outer Continental Shelf Lands Act (43 U.S.C. § 1331 et seq.) (OCS-LA), the Natural Gas Act (15 U.S.C. § 717

John M. McCollam, Philip N. Asprodites, Gordon, Arata McCollam, Stuart & Duplantis, New Orleans, La., for plaintiff-appellant, Amoco Production Co.

B. Richard Moore, Jr., Ernest L. Edwards, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans,

1. Actions removable generally:
   (a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441.

2. Federal question:
   The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.
   28 U.S.C. § 1331.

et seq.) (NGA), and the Natural Gas Policy Act of 1978 (15 U.S.C. § 3301 et seq.) (NGPA). Amoco's motion for remand was denied by the District Court on the ground the court had jurisdiction over the controversy under section 23 of the Outer Continental Shelf Lands Act (OCSLA).[3]

The jurisdictional question is now before this court, having been certified by the District Court for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

We rule that the District Court had jurisdiction and acted properly when it denied the motion to remand. Consequently, the case goes back to the District Court for trial on the merits.

### We Don't Take—We Don't Pay

By letter of October 11, 1983, Sea Robin notified Amoco and all other gas producers with whom Sea Robin had contracts for the purchase of natural gas that, due to several circumstances beyond its control,[4] Sea Robin considered that a "general condition of force majeure, impossibility of performance, and commercial impracticability" existed which excused Sea Robin's take-or-pay obligations under its Amoco contracts for the purchase of natural gas. Sea Robin thereafter continued to purchase some gas under its extant contracts, but found it "necessary ... to reduce, from time to time, purchases of gas under its contracts." Purchases were reduced *pro rata*. In those instances in which the prorated purchase volume was below that required under the take-or-pay obligation contained in the contract in question, the payments con-

templated in such a case by that obligation were not made. In other instances, the prorated purchase volume was also below that required by the contract's minimum-take obligation.

By a follow-up letter dated July 18, 1985, Sea Robin reaffirmed its belief in the persistence of this "general condition of force majeure." A third letter, dated May 15, 1986, was directed specifically to Amoco relating to seven enumerated "Amoco Contracts" gas purchase contracts.[5] That letter reiterated once again Sea Robin's contention as set forth in the two previous letters. Shortly thereafter, Amoco filed suit against Sea Robin in the Fifteenth Judicial District Court for the Parish of Vermilion, State of Louisiana.[6]

Sea Robin then removed that suit to the Lafayette/Opelousas Division of the United States District Court for the Western District of Louisiana. Amoco subsequently moved to remand the case to the state court, which the court denied,[7] on the ground that the dispute was one of those "cases and controversies arising out of, or in connection with any operation conducted on the Outer Continental Shelf [OCS] which involve exploration, development, or production of the minerals ... of the [OCS]" over which OCSLA § 23 (43 U.S.C. § 1349(b)(1)) confers jurisdiction upon the District Courts of the United States. The District Court then certified, and this court accepted, the jurisdictional question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[8] The District Court apparently

---

3. Codified at 43 U.S.C. § 1349(b)(1). See n. 13, *infra*.

4. The letter of October 11, 1983, was not included in the record of the case on appeal to this court. Those several circumstances were, however, enumerated in the follow-up letter mentioned below in the text. They included, among other things, "extraordinarily mild temperatures which constitute a significant departure from normal weather patterns; a severe and prolonged economic recession; a precipitous drop in the price of fuels competitive with natural gas; accelerated increases in producer deliverability; increased consumer conservation; and radical changes in the structure of the industry."

5. These contracts were identified in that letter as Gas Purchase Contracts Nos. 300, 306, 319,

334, 362, 389, and 424, which cover the twelve oil and gas lease blocks at issue in this case: East Cameron Blocks 231, 232, 239, 261, 264, 265, and 278; Ship Shoal Blocks 222 and 225; and South Marsh Island Blocks 125, 127, and 128.

6. On June 13, 1986. Docket No. 86–51634–E.

7. In a memorandum ruling dated October 9, 1986.

8. In a contemporaneous case against Sea Robin brought by another producer, (*Pennzoil Producing Company v. Sea Robin Pipeline Company*, Civil Action No. 86–1424 "L" in the District Court; No. 86–4917 on appeal to this court), a similar substantive dispute and an identical jur-

did not reach the question of federal jurisdiction under either the NGA or the NGPA, since the District Court did not set forth an analysis of or otherwise address either the NGA or the NGPA.

### Jurisdiction By Any Other Name

The OCSLA was originally enacted in 1953 following the enactment of the Submerged Lands Act (SLA) that had been enacted earlier that year. The SLA expressly disclaimed any congressional purpose to relinquish any rights of the United States to the natural resources of the subsoil and seabed of the Continental Shelf seaward of the submerged lands as defined, and then declared that all such natural resources "appertain to the United States and the jurisdiction and control of which by the United States is hereby confirmed." [9] Congress thereby asserted the extent of the authority of the United States federal government as against that of the government of Mexico, Cuba, as well as any other nation that might otherwise undertake to explore for, develop, or produce resources from the subsoil and seabed of the OCS or otherwise to occupy the area for purposes other than the right of free navigation. The OCSLA reaffirmed that assertion of national authority, and went a step further. OCSLA § 4 (43 U.S.C.

§ 1333) extended the "jurisdiction and control" of the United States to "the seabed and subsoil of the entire Outer Continental Shelf adjacent to the shores of the United States ... and also to the structures for their development such as artificial islands, drilling platforms, etc." [10]

The OCSLA also provided that the federal government could undertake to grant leases for the development of the natural resources of the OCS.[11] The OCSLA therefore was also an assertion of the authority of the United States federal government as against that of the governments of the several states, which state governments might otherwise undertake to grant oil and gas leases upon the Outer Continental Shelf, as had the state of Louisiana prior to 1953.[12]

In determining federal court jurisdiction, we need not traverse the Serbonian Bog of the well pleaded complaint rule (*See,* 13B. C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure, §§ 3562, 3566) because § 23 of OCSLA expressly invests jurisdiction in the United States District Courts.[13]

■ The word "jurisdiction" appears in the OCSLA at several different junctures. Except in § 1349, however, the word was used by Congress as a synonym for "sover-

---

isdictional question were involved. The District Court did not write a separate opinion in that second case, but instead issued an order dated October 15, 1986, which cited its decision in the *Amoco v. Sea Robin Pipeline Company* (Civil Action No. 86–1591 "L" in the District Court; No. 86–4916 on appeal to this court) as the basis for its reaching the same conclusion in the *Pennzoil* case. Thereafter, on October 30, 1986, the District Court amended its order of October 15, to include a certification for interlocutory appeal under § 1292(b) in the *Pennzoil* case as well. On December 9, 1986, this court granted separate petitions by Amoco and Pennzoil for leave to appeal, and subsequently granted Sea Robin's motion for an order consolidating the two interlocutory appeals.

9. *See* SLA § 9 (43 U.S.C. § 1302).

10. Conference Report No. 1031, *reprinted in* 1953 U.S.Code Cong. and Ad.News 2177, 2184.

11. *See* H.R.Rep. No. 413, Cong., 1st Sess., *reprinted in* 1953 U.S.Code Cong. and Ad.News 2177, 2178 (1953).

12. *Id.* at 2179. *See also United States v. States of Louisiana, Texas, Mississippi, Alabama, and Florida,* 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960).

13. 43 U.S.C. § 1349 provides in pertinent part: (b)(1) Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter. Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

eignty" as part of the provisions delineating the relative powers of the United States federal government on the one hand and the governments of other countries and of the several states on the other.[14] Such a use is within the scope of the meaning of the word in general usage.[15] Only in § 1349 is the word "jurisdiction" used in the special sense which is more familiar to the legal community and which is relevant to this interlocutory appeal, in which "jurisdiction" signifies "the authority by which courts and judicial officers take cognizance of and decide cases."[16] Section 1349 confers upon the federal District Courts jurisdiction to hear and determine certain disputes which Congress anticipated that oil and gas leases on the OCS and operations thereunder might generate, among them "cases and controversies arising out of, or in connection with any operation conducted on the outer Continental Shelf (OCS) which involves exploration, development, or production of the minerals ... of the [OCS]."[17]

The language of § 1349 is supplemented by lengthy definitions of the terms "exploration," "development," and "production" used in that section.[18] Even with that supplementation, however, § 1349 does not permit automatic application. Neither § 1331 nor any other section of the OCSLA gives express guidance as to the meaning of the undefined term "operation" which appears in § 1349.

Perhaps partly for that reason a split of authority of federal jurisdiction over take-or-pay gas purchase contracts under § 1349 both among and within the several Districts of Louisiana has arisen which have mirrored the parties' arguments in this case.[19]

---

14. House Report 413, *supra* n. 11, for instance, mentions as part of the basis for assertion of American "jurisdiction and control" over the OCS the fact that Louisiana had, by undertaking to grant leases, brought about "actual occupancy" of the OCS by Americans. Actual occupancy is an important factor in the acquisition of sovereignty over a territory. *See generally* L. Henkin, International Law: Cases and Materials, pp. 286–309.

15. *See, e.g.,* Webster's New International Dictionary 1347 (2d ed. 1957) (unabridged):
    Jurisdiction.

    .    .    .    .    .

    2. Authority of a sovereign power to govern or legislate; power or right to exercise authority; control.
    3. Sphere of authority; the limits, or territory, within which any particular power may be exercised.
    *Syn.*—Jurisdiction, authority are often interchangeable.
    *Cf.* the first meaning in the same definition:
    1. *Law.* The legal power, right, or authority to hear and determine a cause or causes, considered either in general or with reference to a particular matter; legal power to interpret and administer the law in the premises.

16. Black's Law Dictionary 991 (4th ed. 1951).

17. *See* n. 13, *supra.*

18. OCSLA § 2 (43 U.S.C. § 1331) provides in pertinent part:
    When used in this subchapter.... (k) The term "exploration" means the process of searching for minerals, including (1) geophysical surveys where magnetic, gravity, seismic, or other systems are used to detect or imply the presence of such minerals, and (2) any drilling, whether on or off known geological structures, including the drilling of a well in which a discovery of oil or natural gas in paying quantities is made and the drilling of any additional delineation well after such discovery which is needed to delineate any reservoir and to enable the lessee to determine whether to proceed with development and production;
    (*l*) The term "development" means those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered;
    (m) The term "production" means those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and work-over drilling.

19. In the following cases, NO FEDERAL JURISDICTION was held to exist under OCSLA over take-or-pay disputes concerning gas produced from the OCS:
    E.D.La.:
    *Amoco Production Company v. United Gas Pipe Line Company,* No. 86–2966 (E.D.La. Sept. 30, 1986);
    *Pennzoil Producing Co. v. Sea Robin Pipeline Co.,* No. 86–2537 (E.D.La. Sept. 5, 1986);
    *Pogo Producing Company v. United Gas Pipe Line Company,* No. 82–2031 (E.D.La. June 26, 1986);

At oral argument, Amoco contended that the word "operation" in § 1349, though not expressly defined in OCSLA, refers to the doing of some physical act. We agree generally. Were it otherwise, the situs of the "operation ... involv[ing] exploration, development, or production of the minerals ... of the [OCS]" would be uncertain making it extremely difficult to ascertain whether that "operation" had been conducted on the OCS or not (as expressly required by § 1349). This interpretation conforms to the common meaning of the word, and also finds support in the use of the word "operation" elsewhere in OCSLA. For instance, OCSLA § 11 (43 U.S.C. § 1340(a)(1)) refers to the potential for geological and geophysical explorations upon the OCS to "interfere with or endanger *actual operations* under any lease." That provision contemplates two physical acts undertaken upon the OCS at the same time and in the same place. In similar vein, OCSLA § 12 (43 U.S.C. § 1341(c)) refers to the authority of the Secretary of the Interior in time of war or national emergency "to suspend operations under any lease" and mandates that "all such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended." This provision contemplates the cessation of physical acts undertaken upon the OCS. *See also* OCSLA § 12 (43 U.S.C. § 1341(d)).

Of course, "operation" does not stand alone. For § 1349 uses it in conjunction with "any operation conducted on the outer Continental Shelf *which involves exploration, development, or production of the minerals....*" (Emphasis supplied.) This means that one cannot cut up the problem into "operation" as such so that inability to find such an "operation" cuts off further inquiry into exploration, development and production.

### Production—Production, What is Production?

■ At the outset, it is clear that the controversy at issue under the Amoco Contracts centers on production. The statutory definitions (see n. 18, *supra*) indicate that exploration and development generally signify sets of activities that constitute preparation for production of the minerals of the OCS. In this case, those preparations were complete and production had begun. It is the subsequent *cessation, suspension or reduction* of production which gives rise to the controversy.

The Amoco Contracts apparently were unremarkable gas purchase contracts. Each contained both a (i) take-or-pay provision—which required Sea Robin either to take or to pay for a minimum quantity of gas per year—and a (ii) minimum-take provision—which required that Sea Robin actually take a minimum quantity of gas per month.[20] In addition, the contract permits

*Pogo Producing Company v. United Gas Pipe Line Company,* No. 86–2030 (E.D.La. May 20, 1986);
*Amoco Production Company v. Southern Natural Gas Company,* No. 85–3486 (E.D.La. Sept. 11, 1985).
W.D.La.:
*Pennzoil Producing Co. v. Sea Robin Pipeline Producing Co.,* No. 86–1590 (W.D.La. Aug. 18, 1986);
*Pogo Producing Company v. Sea Robin Pipeline Company,* No. 84–3364 (W.D.La. Dec. 7, 1984);
*Amoco Production Company v. Tenneco, Inc.,* No. 83–1497 (W.D.La.1983).
M.D.La.:
*King Ranch, Inc. v. Transcontinental Gas Pipeline Corp., et al.,* No. 87–0061 "B" (M.D. La., Feb. 17, 1987);
Other:
*ANR Pipeline Co. v. Conoco, Inc.,* 646 F.Supp. 439 (W.D.Mich.1986);

In contrast, the following cases held that THERE IS FEDERAL JURISDICTION under OCSLA over take-or-pay disputes concerning gas produced from the OCS:
W.D.La.:
*Amerada Hess Corporation v. United Gas Pipe Line Company,* No. 85–0847 (W.D.La. Aug. 1, 1985);
*Superior Oil Company v. Transco Energy Company,* 616 F.Supp. 98 (W.D.La.1985);
*Superior Oil Company v. Columbia Gas Transmission Corporation,* No. 83–1910 (W.D.La. Aug. 25, 1983);
Other:
*Transcontinental Gas Pipeline Corporation v. Mesa Petroleum Company,* No. H–82–0293 (S.D.Tex. Oct. 4, 1982).

**20.** The monthly minimum quantity of gas in the minimum-take provision in each contract was less than one-twelfth the annual minimum quantity of gas in the take-or-pay provision.

the purchaser to "make up" any deficiency in the amount of gas [21] it actually takes under the take-or-pay obligation in a particular year by taking it during the succeeding five years. We know that the obligations under the (i) take-or-pay and (ii) minimum-take provisions are in issue and constitute the heart of the underlying dispute in this case. What else those contracts required of the parties is uncertain since, oddly, the record does not contain a complete copy of any one of those contracts although it contains substantial extracts of some of the relevant provisions.[22]

In terms of the actual production from the covered wells, Sea Robin as the pur-

---

The minimum-take provision therefore served to limit Sea Robin's freedom that otherwise existed under the take-or-pay provision, by setting a floor on the proportion of the minimum annual quantity of gas that Sea Robin could elect to take rather than to pay for. For instance, in Gas Purchase Contract No. 389, covering East Cameron Block 231, the monthly minimum quantity of gas in the minimum-take provision was equal to 5.42% of the annual minimum quantity of gas in the take-or-pay provision, so that the minimum-take provision required Sea Robin actually to take each year 65% of the gas that the take-or-pay obligation standing alone required Sea Robin either to take or to pay for. *See* n. 22, *infra*.

21. During those five years, quantities of gas taken in excess of the specified minimum annual quantity are credited against the deficiency. This means that in periods in which the taking is low, the payment made in the year of the deficiency for gas not actually received amounts to a prepayment for gas actually to be received at some point during the succeeding five years. Thus, the so-called take-or-pay obligation might be characterized more accurately—though more ponderously—as an "either take now and pay now or pay now and take later" obligation.

22. Amoco's petition in state court is in the record. According to that petition, the take-or-pay provision of Contract No. 389, for instance, reads as follows:

1. *Gas Well Gas.*
A. *Annual Minimum Quantity Purchase Obligation.* Subject to the other terms and provisions hereof, [Sea Robin] shall have the right and option, at any time and from time to time, to purchase all of the Gas Well Gas committed hereto which can be produced from the lands and leaseholds covered hereby, but shall only be obligated to purchase such Gas Well Gas in the quantities provided for herein. [Sea Robin] agrees to take from [Amoco] hereunder during each Contract Year or to pay [Amoco] for, whether taken or not, quantities of Gas Well Gas which are equal to the Annual Minimum Quantity for such Contract Year.
B. *Payment for Gas Well Gas Not Taken.* [Sea Robin] shall, within sixty (60) days after the end of each Contract Year, furnish [Amoco] a statement showing the calculation of the Annual Minimum Quantity for

such Contract Year and the quantity of Gas Well Gas taken by [Sea Robin] hereunder during such Contract Year. [Sea Robin] shall make payment for a quantity of Gas Well Gas equal to the amount, if any, by which the Annual Minimum Quantity for the Contract Year covered by the statement exceeds the quantity of Gas Well Gas taken by [Sea Robin] hereunder during the Contract Year at the weighted average price (excluding Tax reimbursements) paid for Gas Well Gas during each Contract Year.

* * *

2. *Oil Well Gas.* [Sea Robin] agrees, subject to the terms, provisions and limitations hereof, to purchase hereunder, all of the Oil Well Gas produced from the lease covered hereby.

The minimum-take provision of Contract No. 389 reads as follows:
D. *Monthly Minimum.* [Sea Robin] agrees to take from [Amoco] hereunder each calendar month an amount of Gas Well Gas at least equal to five and forty-two hundredths percent (5.42%) of the Annual Minimum Quantity then in effect.

The foregoing extracts indicated the existence of the take-or-pay and minimum-take obligations, but did not alone suffice to indicate the amounts of gas involved in each obligation. Accordingly, the state court petition also informs the reader that (i) the term "Annual Minimum Quantity" appearing in both the take-or-pay and minimum-take provisions set forth above is defined elsewhere in Contract No. 389 as "the quantity of Gas Well Gas equal to the sum of the Daily Contract Quantities in effect for each day during each contract year, and (ii) the contract defines the term "Daily Contract Quantity" appearing in the definition of the term "Annual Minimum Quantity" as follows:
(6) The term *"Daily Contract Quantity"* as used herein, shall, for the periods indicated, mean a quantity of Gas Well Gas determined by the following calculations: (1) For each day during the first thirty-six (36) months beginning on the date deliveries commence hereunder, the quantity of Gas Well Gas equal to ninety-five percent (95%) of [Amoco's] Delivery Capacity shall be the Daily Contract Quantity. (2) For each day during the remaining term of this Contract, commencing upon the expiration of the period set forth in (1) above, the quantity of Gas Well Gas equal to eighty-five percent

chaser determines through its periodic "nominations" the amount of gas to be taken for that period of time.[23] The significance of these "nominations" was much discussed at oral argument. Counsel for Sea Robin was at one point asked "Is this nomination a requirement of the federal authorities on production or the operation of the outer continental shelf wells? ... Who imposes the requirement of nominations? Is that done by contract?" Counsel initially replied flatly "It's done by contract." Counsel then elaborated:

> The scheme of production and transportation—purchase and transportation—necessarily anticipates that the pipeline will make those nominations because the

pipeline must under federal law allocate space on its line on a non-discriminatory basis.[24]

In resolving the question of jurisdiction under § 1349, we think this record safely permits the court to take judicial notice of certain operating considerations unique to oil and gas wells. These wells are not like mines for solid minerals, where one can mine as fast or slowly as one cares or even interrupt mining operations entirely for relatively long periods and be secure in the knowledge that whatever mineral wealth is there to be had will eventually be procured. Changes in the rate of oil or gas flow and/or interruptions in that flow not only cause a change in the actual "produc-

---

23. (85%) of [Amoco's] Delivery Capacity shall be the Daily Contract Quantity.

Related to this is the contractual term "Delivery Capacity," contained in Contract No. 389. The definition of that term is not among the portions of that contract contained in the record, but "Delivery Capacity" is mentioned in the definition of "Daily Contract Quantity" quoted at n. 22, *supra.* As to this, there was no explicit challenge by Amoco to Sea Robin's counsel's statement on oral argument:

> there is no question that *unless and until Sea Robin nominates under this contract the volume of gas to be produced, production will not occur on the outer continental shelf with respect to these wells.* And that is a contract right that Sea Robin has.... Gas is not produced until Sea Robin pipeline company nominates or requests a volume of gas to be produced. And the amount of gas to be produced is determined in accordance with a *delivery capacity provision of the contract* and the testing of the wells to determine how much they can produce. And disputes have in the past and do continue to arise and will be involved in this case as to what the wells were even capable of producing and when the obligation of Sea Robin to nominate and in what amounts the nominations of Sea Robin had to be in order to fulfill the requirements under the contract.

It is not disputed that there is a Delivery Capacity Provision in each contract which provides a procedure for the testing of the wells concerned in order to determine how much gas they can produce. That testing determines the Delivery Capacity which in turn determines the Daily Contract Quantity which in turn determines the Annual Minimum Quantity which in turn determines the Monthly Minimum.

Sea Robin periodically nominates—i.e. fixes the volun   of gas to be produced and delivered into its pipeline system—each day on the basis of its own assessment as to what volume it can and will accept into its pipeline for that period.

Presumably, Sea Robin is free to nominate whatever amount of gas it sees fit to nominate so long as that amount does not exceed the Delivery Capacity. Of course, Sea Robin is obligated under the Amoco contract to nominate at a minimum such volumes as is required to meet its minimum-take obligations. Contractually, it may also be liable for any deficiency in its take-or-pay obligation although, unlike the minimum-take requirement, it may not have an obligation to nominate such volumes.

24. Sea Robin's reference to a federal requirement to provide "non-discriminatory access to shippers and non-shippers alike" probably refers to Federal Energy Regulatory Commission Order No. 436, 150 Fed.Reg. 42,408 (October 18, 1985). *See Associated Gas Distributors v. F.E. R.C.,* 824 F.2d 981 (D.C.Cir.1987). That order makes provisions for requiring pipelines to provide non-discriminatory transportation service for gas with respect to which the pipeline company itself is not the purchaser, and which gas may be in fact in competition with gas with respect to which the pipeline company is the purchaser. This assumption is supported by a reference to Sea Robin's "Eighteenth Defense" to Amoco's complaint in federal District Court in which Sea Robin asserts the following:

> Amoco is not entitled to the remedy of specific performance of any alleged contractual obligation of Sea Robin to take and pay for specified quantities of natural gas, inasmuch as Amoco has an adequate remedy available to it through utilization of programs authorized by the FERC for the amelioration of problems associated with excess deliverability of natural gas. Utilization of these programs would permit Amoco to sell its gas to an alternate market, with Sea Robin, providing transportation service. Sea Robin stands ready to cooperate with Amoco so that Amoco may avail itself of these programs.

tion"[25] of the well involved for the duration of the change or the interruption, but may also decrease or affect the potential "production" that is or could ultimately be recovered from the well or the particular reservoir.

Specialized engineering considerations are, of course, outside the expertise of the court. Consequently, we cannot address them except in the most general way. Clearly, however, the efficient exploitation of the minerals of the OCS, owned exclusively by the United States since the declaration of supremacy in the SLA, was at least a primary reason for OCSLA.[26] Just as clearly, any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS. Such a dispute was intended by Congress to be within the grant of federal jurisdiction contained in § 1349. We determine that the record is sufficient to conclude that the controversy concerning performance of take-or-pay and minimum-take obligations under these contracts is just such a dispute.

Exercise of take-or-pay rights, minimum-take rights, or both, by Sea Robin necessarily and physically has an immediate bearing on the production of the particular well, certainly in the sense of the volume of gas actually produced. Dispute by the parties of their respective rights, duties, defenses, and obligations is thus a controversy "arising out of, or in connection with (A) any operation ... which involves exploration, development, or production of the minerals ... § 1349(b)(1).

Pursuing these conceptual factors there is every reason to conclude also that the operation and controversy over such take-or-pay obligations will have consequences as to production of the well (and reservoir) in the sense of the productive process and productibility of the well/reservoir.

We hold that this controversy is within federal jurisdiction under OCSLA.

AFFIRMED.

---

**25.** The word "production" is used in the oil and gas industry in several different but related senses. A definition for the term is found in Williams and Meyers, Oil and Gas Law (Manual of Terms) 755 (1969): "(1) The act or process of producing; that which is produced.... (2) As used in common speech, producing oil or gas wells, *e.g.,* in the sentence, 'Smith has production in Harris County.'" According to this definition, the term can be used to refer to an abstract noun—the act or process of producing—or to either of two concrete nouns—either the *products* of an oil or gas well or the *well* itself. This tripartite nature of the term "production" has always to be kept in mind. The OCSLA does not compel the interpretation that the word "production" is used there in that abstract-noun sense, to refer to the process of producing, i.e. to a set of activities, as specified (though not exhaustively enumerated) in § 1331(m). Although the net result of all "oper-

ations conducted on the [OCS] ... involv[ing] production of the minerals ... of the [OCS]"—may be *measured* by the total quantity of minerals produced, there is no sharp line between the abstract-noun sense of the word "production" and one of the two concrete-noun senses of the word "production." We conclude that Congress did not purposefully choose one rather than the other of the various meanings of "production." Rather it should be applied to effectuate the congressional grant of jurisdiction where that would enhance or achieve control of the national resources by the national government. This would include take-or-pay, minimum-take provisions, the application and enforcement of which may well have significant national importance. *Associated Gas Distributors, supra* n. 24, at 1023, 1044 and 1045.

**26.** *See* n. 11, *supra.*