United States Court of Appeals,

Fifth Circuit.

No. 93-3401.

EP OPERATING LIMITED PARTNERSHIP, Plaintiff-Appellant, Cross-Appellee,

v.

PLACID OIL CO., et al., Defendants-Appellees,

v.

MANTA RAY GATHERING SYSTEMS, Defendant-Appellee, Appellant-Cross-Appellant.

July 21, 1994.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before JOHNSON, BARKSDALE, and DeMOSS, Circuit Judges.

JOHNSON, Circuit Judge:

EP Operating Limited Partnership ("EP"), a co-owner of certain property located on the Outer Continental Shelf ("OCS"), filed suit against its co-owners to partition the property. Jurisdiction in federal court was premised on the Outer Continental Shelf Lands Act ("OCSLA").[1] A group of co-owners, led by Placid Oil Co. ("Placid"), joined issue and filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). The district court granted this motion and EP appeals.[2] We REVERSE and REMAND.

---

[1]43 U.S.C. § 1331 *et seq.*

[2]Also appealing is Manta Ray Gathering Systems, Inc. ("Manta Ray"). This nominal defendant also seeks partition of the property.

1

I. FACTS AND PROCEDURAL HISTORY

In May 1986, EP, Placid, certain predecessors in interest to Manta Ray, and various other entities jointly agreed to acquire two federally-created offshore pipeline rights-of-way.[3]  Pursuant to their agreement, the co-owners constructed on these rights-of-way an oil pipeline, a natural gas pipeline, an offshore platform and related processing facilities (collectively, the "offshore facilities").[4]

Between November 1988 and April 1990, these offshore facilities were used to process and transport minerals.  However, in April of 1990, it was determined that the wells which were being serviced by the offshore facilities were no longer producing in paying quantities and thus further operation of the mineral leases was no longer economically feasible under the existing market conditions.  Hence, the wells were shut down and the offshore facilities have lain dormant since that time.[5]

The current dispute arose out of EP's attempt to recover some

---

[3]The pipeline rights-of-way were granted by the United States Department of the Interior, acting through the Minerals Management Service ("MMS"), and were assigned O.C.S.G. Nos. 8390 and 8391.  These leases will expire in April 1995, unless the facilities are operating before then.

[4]Accordingly, the property in issue herein consists of two federally-created leases, approximately 52 miles of pipeline attached to the seabed of the OCS, an offshore platform and certain other production facilities.  All of this property is situated on the OCS and is held for the purpose of the production and development of minerals from the OCS.

[5]Although the offshore facilities are not currently being used to transport minerals, ongoing maintenance of the facilities is being conducted as required by MMS regulations.  *E.g.,* 30 C.F.R. §§ 250.130, *et seq.* and §§ 250.150, *et seq.*

value from these unused and depreciating assets on the OCS. According to EP, these attempts have been hampered by the fact that there are nine co-owners and that the property is encumbered by numerous liens. This unwieldy situation, EP alleges, has made it difficult to conduct negotiations to connect the offshore facilities to producing leases or other pipelines or to sell or salvage the equipment. Thus, unable to reach a voluntary agreement as to the disposition of these offshore facilities, EP brought suit against its co-owners[6] and against several record lienholders[7] seeking a partition by licitation. This is the first step, EP maintains, in facilitating the reuse of these offshore facilities.

One of the co-owners named as a defendant, Manta Ray, answered EP's suit and filed counter-claims and cross-claims seeking substantially the same relief as that sought by EP. The other co-owners, however, contest the instant partition action. Leading the charge for the defense is Placid Oil Co., the operator of the offshore facilities under the parties' joint agreement.

Subject matter jurisdiction for this action was premised on the OCSLA. In particular, EP alleged that jurisdiction was proper

[6]The co-owners are HI Production Company, Inc., Hunt Petroleum Corporation, F.C. Vickers, in his capacity as trustee for the Nelson Bunker Hunt Trust Estate, J.R. Holland, Jr., in his capacity as trustee for the Lamar Hunt Trust Estate, Manta Ray Gathering Systems, OPUBCO Resources, Inc., Petro-Hunt Corporation and Placid Oil Company.

[7]The ownership interests of several of the co-owners are burdened by liens. The holders of these liens made defendants herein are Cooper Industries, Inc., Cameron Offshore Engineering, Inc., ABB Vetco Gray, Inc., HI Production Company, Inc., OPUBCO Resources, Inc., Hunt Petroleum Corporation, Drill-Quip, Inc., David Matthew Wright and Southern Associates, Inc.

pursuant to section 1349 of the OCSLA which explicitly grants the district courts jurisdiction over cases or controversies arising out of or in connection with operations on the OCS. Alternatively, EP argued that because section 1333 of the OCSLA provided the substantive law for the dispute, federal question jurisdiction was proper pursuant to 28 U.S.C. § 1331.

The appellees, though, filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). They contended that jurisdiction was not proper under section 1349 because the current action would not affect any "operation" on the OCS and that section 1333 was never intended to provide subject matter jurisdiction to the district courts. The district court agreed and granted the motion to dismiss. EP and Manta Ray now appeal.[8]

## II. STANDARD OF REVIEW

This Court reviews a dismissal under Fed.R.Civ.P. 12(b)(1) de novo using the same standards employed by the district court. *Benton v. United States,* 960 F.2d 19, 21 (5th Cir.1992). Therefore, taking all of EP's and Manta Ray's factual allegations as true for purposes of this appeal, we must independently determine whether the district court properly dismissed the claim for lack of subject matter jurisdiction. *Id.*

## III. JURISDICTION PURSUANT TO 43 U.S.C. § 1349(b)(1)

The OCSLA was passed in 1953 to establish federal ownership

---

[8]The United States has also filed an amicus curiae brief urging reversal of the district court's judgment.

and control over the mineral wealth of the OCS and to provide for the development of those natural resources. *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 480 n. 7, 101 S.Ct. 2870, 2876 n. 7, 69 L.Ed.2d 784 (1981). The OCSLA thus vests the federal government with a proprietary interest in the OCS and establishes a regulatory scheme governing leasing and operations there. *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,* 754 F.2d 1223, 1227 (5th Cir.1985). Under the OCSLA, the law to be applied to the OCS is exclusively federal, albeit the law of the adjacent state is adopted as surrogate federal law to the extent that such law is applicable and not inconsistent with federal law. *Rodrigue v. Aetna Casualty and Surety Company,* 395 U.S. 352, 357, 89 S.Ct. 1835, 1838, 23 L.Ed.2d 360 (1969); 43 U.S.C. § 1333(a)(2)(A). Moreover, original jurisdiction in the district courts is provided for in the OCSLA over all cases arising out of operations on the OCS for the development of the natural resources. Specifically, the pertinent section provides:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals....

43 U.S.C. § 1349(b)(1).

Despite this broadly worded grant of original jurisdiction, the district court herein found that it lacked jurisdiction because the dispute did not involve an "operation" on the OCS. In explaining his reasoning, the district judge stated that

5

> [t]his is a dispute over the ownership and division of property. It does not involve "operations" on the OCS. All exploration, development or production has long since ceased on the property. Plaintiff initiated this action solely for the purpose of selling the property and dividing the proceeds among the owners. There is no relationship to OCS operations, and resolution of this controversy will not alter the progress of production activities on the OCS.

(citations and footnotes omitted). There are two possible bases for this holding. First, the district court may have determined that there was no operation in this particular case as production from this facility had ceased and the offshore facilities had lain dormant for the last three years. Reasoning thus, the district court could have concluded that no decision it made would affect any ongoing operations on the OCS. Alternatively, the district court may have concluded that there was no jurisdiction because of the nature of the cause of action. Under that rationale, there would never be jurisdiction for any partition suit, whether or not the subject property on the OCS was producing minerals, because such a suit merely determines property rights and does not affect "operations" on the OCS.[9] For the reasons stated below, we reject both of these rationales.

First, we address the implication from the district court's opinion that, since the offshore facilities are not currently transporting minerals, there is no "operation" on the OCS. The term "operation" is not defined in the OCSLA. However, this Court has explored the meaning of that term in *Amoco Production Co. v.*

---

[9]Although it is not clear from the appellee's brief, this latter argument was the one advanced by defense counsel at oral argument.

*Sea Robin Pipeline Co.,* 844 F.2d 1202 (5th Cir.1988). In that case, this Court found that the term "operation" contemplated the doing of some physical act on the OCS. *Id.* at 1207. Further, this Court found that it also contemplated the cessation of physical acts undertaken upon the OCS. *Id.*

In the instant case, there have been substantial acts undertaken on the OCS. Approximately fifty-two miles of pipe have been laid on the OCS floor and an offshore platform and other facilities have been erected. Further, acts on the OCS continued after this as, for a time, these facilities were used to transport minerals. The facilities presently lay dormant and the only current activity is ongoing maintenance. However, there undoubtedly will be acts taken on the OCS in the future. In particular, it is very likely that these facilities will be reused in some way to transport minerals again.[10] Alternatively, even if the facilities are never put back into operation, federal regulations mandate that the offshore facilities will eventually have to be cleared off the OCS.[11]

---

[10]In fact, Manta Ray has served notice on the co-owners of its intent to begin transporting minerals through the pipeline.

[11]One concern of the OCSLA is that the resources of the OCS be developed in an environmentally safe manner. *Laredo,* 754 F.2d at 1227. Additionally, the government seeks to ensure that structures erected on the OCS do not interfere with navigation. Accordingly, federal regulations require that when a lease expires or is abandoned, the equipment must be properly cleared from the OCS. 30 C.F.R. § 250.112(i). Also, Article 5 of the Convention on the Continental Shelf, 15 U.S.T. 471, TIAS 5578, states, in pertinent part:

> 1. The exploration of the continental shelf and the exploitation of its natural resources must not result

It is incontrovertible that, at least while the offshore facilities were being utilized to transport minerals, there was an "operation" involving the exploration, development or production of minerals such that there would be jurisdiction in the district court pursuant to section 1349 for cases arising out of, or in connection with, that operation. However, the district court opinion seems to imply that that jurisdiction lapsed when activity on the offshore facilities for the production of the minerals stopped. Additionally, it would appear under this rationale that our jurisdiction would begin again should these offshore facilities be put back into use.

This reasoning is flawed. Production from oil and gas facilities can be interrupted and there can be a hiatus in activity for any number of reasons. Such temporary lulls in activity should not control jurisdiction in federal court. These offshore facilities were erected on the OCS, they were used to transport minerals in the past, they may be used to transport minerals in the future, and they will eventually have to be removed pursuant to federal regulations. We find that there is an "operation" on the OCS which can be the basis of jurisdiction in the district court during this entire cycle as opposed to jurisdiction turning on and off according to whether there is current activity on the

---

in any unjustifiable interference with navigation, fishing or the conservation of the living resources of the sea....

5. ... Any installations which are abandoned or disused must be entirely removed.

facilities erected on the OCS.

We find this broad view of the term "operation" amply supported by the statute. That term does not stand alone, but rather it is used in conjunction with the terms "exploration," "development," and "production." *Sea Robin,* 844 F.2d at 1207. Those terms are defined broadly[12] in the statutes to encompass the full range of oil and gas activity from locating mineral resources through the construction, operation, servicing and maintenance of facilities to produce those resources. We find that the term "operation" should be read equally as broadly.

Further, the view that "operations" do not cease when

_____

[12]43 U.S.C. § 1331 provides in pertinent part:

> When used in this subchapter.... (k) The term "exploration" means the process of searching for minerals, including (1) geophysical surveys where magnetic, gravity, seismic, or other systems are used to detect or imply the presence of such minerals, and (2) any drilling, whether on or off known geological structures, including the drilling of a well in which a discovery of oil or natural gas in paying quantities is made and the drilling of any additional delineation well after such discovery which is needed to delineate any reservoir and to enable the lessee to determine whether to proceed with development and production;
>
> (l) The term "development" means those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered;
>
> (m) The term "production" means those activities which take place after the successful completion of any means for the removal of minerals including such removal, field operations, transfer of mineral to shore, operation monitoring, maintenance and work-over drilling.

production is halted finds support in then-district Judge Rubin's opinion in *Fluor Ocean Services, Inc. v. Rucker Co.,* 341 F.Supp. 757 (E.D.La.1972). In *Fluor,* an offshore drilling platform sank as a result of damage from Hurricane Camille and the issue was whether there was jurisdiction under section 1333(b)[13] for a contract to raise the platform. Obviously, operations for the production of minerals from this platform ceased when the platform sank. However, even though there was no current activity for the production of minerals on the OCS, Judge Rubin still found that there was jurisdiction. In so doing, he noted that some of this equipment would be used again and, further, that federal regulations required that the lessee remove the equipment from the OCS. *Id.* at 758-59. Then, he concluded that

> [i]t is clear that the court had jurisdiction over the structure when it was being used for oil and gas exploration on the outer Continental Shelf. To hold that jurisdiction was lost when the structure sank would require a narrow reading of the jurisdictional grant of 1333(b). However, a broad, not a narrow, reading of this grant is supported by the clear exertion of federal sovereignty ...

*Id.* at 759-60.

Accordingly, even though there is no current production from the offshore facilities involved herein, we find that there is an "operation" on the OCS in this case. The question that remains, however, is whether the instant partition suit "arises out of, or in connection with" that operation involving exploration, development or production, or which involves rights to such minerals. 43 U.S.C. § 1349(b)(1).

---

[13]This section is now § 1349.

10

This question implicates the second possible rationale for the district court's ruling, and the contention made by counsel for the appellees at oral arguments, which is that, because of the nature of a partition suit, it is simply does not affect any "operation" on the OCS. This is because a partition suit merely determines property rights and does not involve actions on the OCS.

This argument requires a narrow reading of the jurisdictional grant of section 1349, though, and a myopic focus on the term "operation." We, however, stand once again alongside Judge Rubin and conclude that "a broad, not a narrow, reading of this grant is supported by the clear exertion of federal sovereignty ..." *Fluor,* 341 F.Supp. at 760; *see also Recar v. CNG Producing Co.,* 853 F.2d 367, 369 (5th Cir.1988). Moreover, we note that the statute provides that there is jurisdiction for cases or controversies "*arising out of, or in connection with* " any "*operation* " conducted on the OCS for the development of the mineral resources. 43 U.S.C. § 1349(b)(1). As we have already determined that there is an "operation" on the OCS for the development of the natural resources in this case, we find that our inquiry should now focus on the phrase "arising out of, or in connection with."

This phrase is undeniably broad in scope. While the instant partition action is merely an action to determine property rights, the subject property is millions of dollars worth of offshore equipment attached to the seabed of the OCS. These offshore facilities exist solely to conduct operations on the OCS for the production of mineral wealth. In light of this, we conclude that

11

a suit to determine ownership of these offshore facilities is sufficiently connected with the operation of those offshore facilities to come within the broad phrase "arises out of, or in connection with."

Further, this broad reading of the jurisdictional grant of section 1349 is supported by the expansive substantive reach of the OCSLA. "The purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the outer Continental Shelf." *Rodrigue,* 395 U.S. at 355, 89 S.Ct. at 1837. To that end, Congress established federal control over the OCS by extending the political jurisdiction of the United States to the subsoil and seabed of the OCS and to "all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom...." 43 U.S.C. § 1333(a)(1). Then, Congress determined that the law applicable would be exclusively federal law with the law of the adjacent state being adopted as surrogate federal law to the extent that such law was applicable and not inconsistent with federal law. *Rodrigue,* 395 U.S. at 357-58, 89 S.Ct. at 1838.

This body of substantive law identified in section 1333 was intended "to govern the full range of potential legal problems that might arise in connection with operations on the Outer Continental Shelf ..." *Laredo,* 754 F.2d at 1228. Thus, the OCSLA casts a broad substantive net in section 1333. Further, we find that the

12

most consistent reading of the statute instructs that the jurisdictional grant of section 1349 should be read co-extensively with the substantive reach of section 1333.[14] *Laredo*, 754 F.2d at 1228 (describing the substantive body of law under the OCSLA and the district court's original jurisdiction as "correlative"). Accordingly, consistent with the breadth of the substantive reach of the OCSLA, we find that Congress intended for the "judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the Outer Continental Shelf." *Id.*

Instructive as to what types of cases fall within this broad range of legal disputes is the *Sea Robin* case. In *Sea Robin,* the issue was whether section 1349 provided jurisdiction over a suit involving take-or-pay obligations in a contract for the purchase of natural gas. 844 F.2d at 1203. In resolving that issue, the *Sea Robin* Court noted that a primary purpose of the OCSLA was "the efficient exploitation of the minerals of the OCS, owned exclusively by the United States ..." *Id.* at 1210. Hence, the Court reasoned that any dispute that alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals was intended by Congress to come within the jurisdictional grant of section 1349. *Id.* As the Court concluded that exercise of the take-or-pay rights

---

[14]After establishing that the law applicable to the subsoil and seabed of the OCS and to structures erected thereon is federal law, § 1333(a)(2)(A) then provides that all "such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States."

in the dispute before it would threaten the total recovery of federally-owned minerals from the OCS, the Court found jurisdiction under section 1349.[15]  *Id.*

For the same reason, this Court found jurisdiction in *United Offshore Co. v. Southern Deepwater Pipeline Co.,* 899 F.2d 405 (5th Cir.1990).  In that case, two partners battled for control of a gas pipeline.  Although we found that the case was "one step removed" from actual operation on the OCS, we still found jurisdiction because resolution of the suit would affect the efficient exploitation of resources from the Gulf and thus threaten the total recovery of federally-owned minerals.  *Id.* at 407.

The instant suit is a partition action to determine ownership rights.  The appellants have alleged, and, for the purposes of this

_____

[15]Appellees maintain that the only reason that the *Sea Robin* Court found jurisdiction was because it found that the take-or-pay dispute before it could "alter[ ] the *progress* of production activities" and that it would have an "*immediate* bearing on the production of the particular well ..."  *Sea Robin,* 844 F.2d at 1210.  From this, the appellees argue that there is a temporal component to a finding of jurisdiction under the OCSLA requiring that any affect on OCS operations must be *immediate.*

    We find, however, that while the *Sea Robin* Court did note that resolution of the dispute before it would have an immediate effect, the reasoning supporting its holding was broader.  That reasoning was that the federal government was concerned with the efficient exploitation of the mineral wealth of the OCS.  *Id.*

    The government's interest in the minerals of the OCS is proprietary.  *Laredo,* 754 F.2d at 1227.  It leases out the minerals and receives a royalty on the amount produced.  Thus, the government is concerned with the total recovery of the federally-owned minerals from the reservoirs underlying the OCS.  This interest is implicated whether a given controversy threatens that total recovery either immediately or in the long-term.

appeal, we must accept as true, that resolution of these ownership rights will facilitate the reuse, sale or salvage of these offshore facilities.  Any of these actions, we conclude, would affect the efficient exploitation of resources from the OCS and/or threaten the total recovery of federally-owned resources.  Accordingly, we hold that the instant partition suit is a controversy "arising out of, or in connection with (A) any operation ... which involves exploration, development, or production of the minerals [of the OCS] or which involves rights to such minerals."  43 U.S.C. § 1349(b)(1).

IV. CONCLUSION

For the reasons stated above, we hold that the instant controversy is within the jurisdictional grant of authority in section 1349.[16]  Therefore, the district court's dismissal for lack of subject matter jurisdiction is hereby REVERSED and this case is REMANDED to the district court for further proceedings.

---

[16]As we decide this case under § 1349, we do not address appellants' argument that 28 U.S.C. § 1331 provides an alternative basis for jurisdiction.

15