**BRITISH BORNEO EXPLORATION, INC., et al.**

v.

**ENSERCH EXPLORATION, INC., et al.**

**Civil Action No. 98–1609.**

United States District Court,
E.D. Louisiana.

Nov. 24, 1998.

---

Paul Edward Bullington, Scott A. O'Connor, C. Peck Hayne, Jr., Gordon, Arata, McCollam & Duplantis, LLP, New Orleans, LA, for Plaintiffs.

Stephen H. Kupperman, Stone, Pigman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, for Defendants.

### *ORDER AND REASONS*

DUVAL, District Judge.

Before the Court is a Motion to Dismiss, or alternatively, to Transfer to the Southern District of Texas filed by defendant EEX Corporation, individually and as successor in interest to Enserch Exploration, Inc. ("EEX"). Defendant contends that dismissal is appropriate because (1) the Court lacks subject matter jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), and (2) the instant declaratory judgment action filed by plaintiffs British–Borneo Exploration, Inc. ("BBEI") and its wholly owned subsidiary British–Borneo Petroleum, Inc. ("BBPI") (collectively, "British–Borneo") was filed solely in anticipation of EEX's suit in Texas and is an impermissible effort to exploit the first-to-file rule and preempt EEX's choice of forum. In the alternative, EEX seeks to have this matter transferred to the Southern District of Texas.

The Court has reviewed the pleadings, memoranda and the relevant case law and finds that the Court has jurisdiction over this suit. However, even though this case was the first-filed suit, there are compelling circumstances such that this declaratory judgment suit filed in anticipation of litigation must be dismissed without prejudice.

### Background

British–Borneo filed this declaratory judgment action on June 1, 1998. The case arises out of a dispute concerning the right to explore for and produce minerals from four federal leases covering lands located in the Outer Continental Shelf ("OCS") region of the Gulf of Mexico in the Green Canyon area offshore the Eastern District of Louisiana, south of Lafourche and Terrebonne Parishes ("Green Canyon Leases"). EEX is a Texas corporation with its principal place of business in Texas. BBEI and BBPI are Texas corporations with their principal places of business in Texas.

In the spring of 1997, British–Borneo apparently became interested in acquiring mineral rights held by EEX and others in certain specified OCS lands offshore Louisiana (the "Marketed Area"), including the Green Canyon Leases. In order to obtain confidential information, including geological and geophysical data, maps, models and interpretation with respect to those oil and gas leases in the Marketed Area, British–Borneo signed a Confidentiality Agreement ("the Agreement") on April 18, 1997. This document contained at paragraph 6a an agreement that provided that if on or before May 1, 1997, British–Borneo acquired an interest in the Marketed Area, it:

> shall immediately notify EEX in writing of such acquisition, whereupon EEX shall have the right and option, but not the obligation, for a period of thirty (30) days from the receipt of such notice to acquire such interest from BBEI. Such notice shall include, but not be limited to, a detailed summary of all costs incurred in the acquisition of the interest and copies of all documents affecting, relating to, or defining the terms and conditions of such acquisition. . . .

(Memorandum in Support of Motion to Dismiss, Exhibit "A") ("EEX's Exhibit 'A' "). The Agreement contained a choice of law provision at paragraph 11(a) whereby the parties agreed that the contract was to be governed by and interpreted in accordance with the laws of the State of Texas.

> Paragraph 9 of the Agreement provided:
>
> If BBEI acquires or enters into an agreement with EEX contemplating the acquisition of any of EEX's rights in the Area, then this Agreement, **insofar as it covers the interest acquired,** shall terminate automatically on the date BBEI enters into a further agreement which contains provisions covering the confidentiality of such data acquired in the Area. **Unless earlier terminated under the preceding sentence, the confidentiality obligations, and restrictions with respect to and obligations on, interest acquired by BBEI as provided herein, shall terminate on May 1, 1999.**

(EEX Exhibit A. ¶ 9) (emphasis added). On September 25, 1997, a letter from EEX to

British Borneo was sent which included a "substitute Page 2" to the Agreement. Apparently, a typographical error had been made and the expiration date of the Agreement was suppose to have been **May 1, 1999** rather than 1997.[1]

After the Agreement was executed, BBPI began negotiations with EEX and its co-owners in the Green Canyon Leases (including Mobil Oil Corporation ("Mobil")) for BBPI to acquire all their interests in the Green Canyon Leases. Prior to August 1997, EEX had acquired exploration and production rights in oil and gas leases relating to those blocks previously mentioned (blocks 253, 254, 297 and 298) of the Gulf of Mexico, located in Green Canyon area. EEX's interest in the Green Canyon blocks included rights to an area known as the Allegheny Field. The Allegheny Field was within EEX's "shallow rights" to the Green Canyon acreage; EEX also had "deep rights" to explore and produce oil and gas lying at the depths beneath the Allegheny Field. (EEX's Memorandum, Affidavit of Michael Altobelli, ¶ 3).

On or about August 19, 1997, EEX and BBPI executed a Letter of Intent for BBEI's purchase of one half of EEX's rights in the Allegheny field. On August 28, 1997, a Purchase and Sale Agreement that incorporated the Letter of Intent and completed the transfer of one-half of EEX's interests in the Allegheny Field to BBEI was executed. It is uncontested that BBPI purchased one-half of EEX's interest in the Green Canyon Leases **excluding certain "deep rights."** It is also uncontested that EEX purchased from Mobil its entire interest in the Green canyon Leases **including deep rights.**

Paragraphs 3.7 and 3.8 of the Purchase and Sale Agreement for the Green Canyon Area, Outer Continental Shelf between EEX and BBPI (EEX's Memorandum, Exhibit C) provide:

3.7 *Contracts, Agreements, Commitments and other Matters.* Except as set forth on Exhibit 3.7, to the best of Seller's knowledge, information and belief after reason-

able inquiry, there are no contracts, agreements, understandings, commitments, or other obligations (other than the oil, gas and mineral leases, surface leases, rights of way and other interests described in Exhibit 1.1 hereto and conveyance documents that are a matter of public record in the Louisiana coastal parishes of Jefferson, LaFourche (sic) and/or Terrebonne or that are filed in the "non-Required" filings of the "lease Files" maintained for the Leases in the New Orleans District of the Minerals Management Service (the "MMS") with respect to the Leases) affecting the Assets which are in effect as of the date hereof. Neither Seller nor any parent, subsidiary or affiliate of Seller has breached any provision of the leases or the agreements set forth in Exhibit 3.7 and to the best of Seller's knowledge, information and belief after reasonable inquiry, neither has any other party thereto.

3.8 *Consents and Preferential Purchase Rights.* There are no consents (except governmental consents which are customarily obtained after the assignment of an offshore federal oil and gas lease), agreements or waivers of preferential rights necessary to the valid assignment of the Assets to Buyer at Closing that have not been affirmatively waived or deemed to have been waived by expiration of the appropriate notice period, and there are no preferential purchase rights or calls on production with respect to the production for the Leasehold interests except as may be provided in the agreements listed in Exhibit 3.7, which limit the purchase price for oil or gas, or which are not subject to termination upon 60 days' notice.

(EEX's Exhibit C, ¶¶ 3.7 and 3.8).

British Borneo contends that these paragraphs constitute a representation on the part of EEX that "there are no contracts, agreements, understandings, commitments or other obligations affecting the Green Canyon leases besides those recorded in the public records" and that "there are no waivers of preferential rights necessary to the valid as-

---

1. The letter reads, "This change is made in recognition of your advising that the date shown is a typographical error, and should be amended to coincide with the intent of the parties to the Agreement."

signment of the Green Canyon Leases." Also, EEX approved a British–Borneo August 20, 1997 press release which referred to BBPI's intended acquisition of Mobil's deep rights in the Green Canyon Leases. The Confidentiality Agreement was apparently never filed in any of the listed public records.

After BBPI acquired Mobil's deep rights and after the amendment correcting the May, 1997 date to May, 1999 had been executed by BBEI on October 1, 1997, EEX notified British Borneo shortly thereafter of EEX'S contention that BBPI's acquisition of Mobil's deep rights in and to the Green Canyon Leases triggered EEX's option under the Agreement. British–Borneo disagreed with EEX's position and asserted that any preferential purchase rights that EEX might have had relating to the Green Canyon Leases were waived by EEX or otherwise had terminated. Negotiations to resolve this dispute between these entities thus began in October 1997 and continued intermittently through May of 1998, with various letters and phone conversations allegedly being exchanged.

On April 8, 1998, EEX's General Counsel, Janice Hartrick, wrote a letter to BBEI's James Teringo, Jr. threatening to to pursue legal action if a resolution was not reached within five working days. British Borneo responded by letter dated April 20, 1998 suggesting to attempt to resolve these issues by arranging a meeting between Steve Edrich, Vice President of British–Borneo, and a representative of EEX. On May 28, 1998, Alan Gaynor, Chief Executive of BBEI's London-based parent corporation British–Borneo Petroleum Syndicate, P.L.C., wrote to David Henderson, Chief Operating Officer of EEX, trying to resolve the dispute amicably. The letter requested Mr. Henderson's "early comment." On May 29, 1998, Gaynor apparently attempted to call Henderson. Allegedly, when Gaynor's call had not been returned by June 1, 1998, British–Borneo filed the subject suit against EEX. (British–Borneo's Memorandum, Declaration of Steve Edrich, ¶¶ 11–16, Exhibits 2–4). British–Borneo did not serve EEX with a summons, complaint, or any other notice that an action had been initiated.

On June 22, 1998, EEX filed suit against BBEI in Harris County Texas seeking relief on the same contract issues involved in this action. On June 24, 1998, EEX served BBEI with its Texas petition. BBEI served EEX in this action on June 29, 1998. On July 2, 1998 BBEI removed the Texas action to the United States District Court for the Southern District of Texas, Houston Division.

■ On July 6, 1998, BBEI moved to dismiss the Texas action or transfer it to the Eastern District of Louisiana. That motion was denied without prejudice in order for this Court to rule upon the same issues as dictated by the "first-filed" rule which is "the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir.1997). (Memorandum Opinion entered 9/23/98 in *EEX Corp. v. British–Borneo Exploration. Inc.*, C.A.No. H–98–2102, United States District Court for the Southern District of Texas, Houston Division).

With this background information in mind, the Court now must determine whether OCSLA provides jurisdiction over the subject suit.

### OCSLA Jurisdiction

■ In *EP Operating Limited Partnership v. Placid Oil Co.*, 26 F.3d 563 (5th Cir.1994), the United States Court of Appeals for the Fifth Circuit explained that OCSLA was passed in 1953 to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources. As a result, OCSLA vests the federal government with a proprietary interest in the OCS and establishes a regulatory scheme governing leasing and operations there. *Id.* at 566 *citing Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473 480, 101 S.Ct. 2870, 69 L.Ed.2d 784 N. 7, 453 U.S. 473, 101 S.Ct. 2870 n. 7, 69 L.Ed.2d 784 (1981) and *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.* 754 F.2d 1223, 1227 (5th Cir.1985). Indeed, the federal government grants the very leases for the development of the natural resources of the OCS that are at

issue herein. *Amoco Production Co. v. Sea Robin Pipeline Co.,* 844 F.2d 1202, 1205 (5th Cir.1988).

Section 1349(b)(1) of Title 43 provides the jurisdictional mandate of OCSLA. It provides in pertinent part:

[T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the Outer Continental Shelf, or which involves rights to such minerals.... Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

43 U.S.C. § 1349(b)(1). Thus, from a parsing of the statute, for this Court to exercise jurisdiction over this matter, it must find that this controversy concerns "operations" "involving the exploration, development or production of minerals" or "which involves the right to such minerals."

"Operation" is not defined in the statute. However, its meaning was "explored" in the *Sea Robin* case. At issue in that case was whether OCSLA provided a jurisdictional grant to a federal district court for it to hear a dispute over "take-or-pay" and "minimum-take" provisions of certain natural gas sale/purchase contracts. The appellate court, noting a split of authority, found that the district court had jurisdiction. In so finding, the appellate court undertook an analysis of § 1349. The court "generally" agreed that "operation" "refers to the doing of some physical act." *Sea Robin,* 844 F.2d at 1207. However, the court continued:

Were it otherwise, the situs of the "operation ... involv[ing] exploration, development, or production of minerals ... of the [OCS]" would be uncertain making it extremely difficult to ascertain whether that "operation" had been conducted on the OCS or not (as expressly required by § 1349)....

Of course, "operation" does not stand alone. For § 1349 uses it in conjunction with "any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals ..." (Emphasis supplied.) **This means that one cannot cut up the problem into "operation" as such so that inability to find such an "operation" cuts off further inquiry into exploration, development and production.**

*Id.* (emphasis added).

"Exploration" is defined at 43 U.S.C. § 1331(k) as:

[t]he process of searching for minerals, including (1) geophysical surveys where magnetic, gravity, seismic or other systems are used to detect or imply the presence of such minerals, and (2) any drilling whether on or off known geological structures, including the drilling of a well in which a discovery of oil or natural gas in paying quantities is made and the drilling of any additional delineation well after such discovery which is needed to delineate any reservoir and to enable the lessee to determine whether to proceed with development and production.

"Development" is defined as "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered." 43 U.S.C. § 1331(*l*). Finally, "production" is categorized as "those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and work-over drilling." 43 U.S.C. 1331(m).

In *Placid Oil,* the Fifth Circuit commenting on the term "operation" used in conjunction with these three terms noted, "[t]hose terms are defined broadly in the statutes to encompass the full range of oil and gas activity from locating mineral resources through the construction, operation, servicing and maintenance of facilities to produce those resources." *Placid Oil,* 26 F.3d at 568. In

*Placid Oil,* the Fifth Circuit noted that it stood "once again" alongside Judge Alvin Rubin in his interpretation of this statute found in *Fluor Ocean Services, Inc. v. Rucker Co.,* 341 F.Supp. 757 (E.D.La.1972), which was that " 'a broad, not a narrow, reading of this grant is supported by the clear exertion of federal sovereignty ...' " *Id.* at 569.

In enacting OCSLA, Congress mandated that the law applicable under OCSLA "would be exclusively federal law with the law of the adjacent state being adopted as surrogate federal law to the extent that such law was applicable and not inconsistent with federal law." *Placid Oil,* 26 F.3d at 569; 43 U.S.C. § 1333(a). The Fifth Circuit stated:

> This body of substantive law identified in section 1333 was intended "to govern the full range of potential legal problems that might arise in connection with operations on the Outer Continental Shelf. . . ." *Laredo [Offshore Constructors, Inc. v. Hunt],* 754 F.2d [1223] at 1228. Thus, the OCSLA casts a broad substantive net in section 1333. Further, we find that the most consistent reading of the statute instructs that the jurisdictional grant of section 1349 should be read co-extensively with the substantive reach of section 1333. *Laredo,* 754 F.2d at 1228 (describing the substantive body of law under the OCSLA and the district court's original jurisdiction as "correlative"). **Accordingly, consistent with the breadth of the substantive reach of the OCSLA, we find that Congress intended for the "judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the Outer Continental Shelf."** *Id.*

*Placid Oil,* 26 F.3d at 569.

The Fifth Circuit has also noted that at least a primary reason for OCSLA is to insure the efficient exploitation of the minerals of the OCS which are owned exclusively by the United States. Thus, the appellate court reasoned that "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS. Such

a dispute was intended by Congress to be within the grant of federal jurisdiction contained in § 1349." *Sea Robin,* 844 F.2d at 1210. Indeed, even where the contractual dispute is "one step removed" from one of the three defined areas of covered activity, the Fifth Circuit has found OCSLA provides federal jurisdiction. *United Offshore Co. v. Southern Deepwater Pipeline Co.,* 899 F.2d 405 (5th Cir.1990) (court had jurisdiction over contract dispute concerning management committee deadlock arising from resignation of operator of entity which operated gas pipeline).

██ The case at bar concerns a dispute which directly affects the exploration, development and production of minerals from the deep level regions beneath the Allegheny Field on the OCS in the Green Canyon area. At the core of this suit is whether EEX is entitled under the Confidentiality Agreement to exercise a right to purchase the interest purchased by British–Borneo from Mobil to those certain deep rights in the Green Canyon Field. The key to resolving this matter will be interpretation of those contracts previously discussed which concern rights to leases in the OCS which leases are issued by the United States government under OCSLA. Without the cloud on the title of these four blocks being resolved, further development in the area cannot occur.

The case at bar is readily distinguishable from *Brooklyn Union Exploration Co., Inc. v. Tejas Power Corp.,* 930 F.Supp. 289 (S.D.Tex.1996) and *Harris Trust and Savings Bank v. Energy Assets International Corp.,* 124 F.R.D. 115 (E.D.La.1989) upon which EEX relies. In *Tejas,* the contract dispute concerned price recalculation of natural gas produced on the OCS which production had long-since terminated. The court noted that any decision "will not alter the flow of production or otherwise affect the efficient exploitation of natural resources in the OCS." *Tejas,* 930 F.Supp. at 292. Here, the instant dispute **directly** impacts the flow of minerals; development of the field is impossible because there exists an issue as to whether EEX has a right to exercise it options under the Confidentiality Agreement as alleged.

Likewise, in *Energy Assets*, Harris sought a declaratory judgment that its right to proceeds and products from certain oil and gas leases pledged by one participant primed the rights of another party that had advanced cash in exchange for certain working interest and production payments by that participant. The *Energy Assets* court found *Sea Robin* was inapplicable apparently because it believed that the dispute before it did not actually affect actual production on the OCS. For the reasons stated before, the Court finds this dispute directly affects the production of minerals.

In addition, the Court would note that in the context of exploration, the primary "operation" is the procuring of leases and rights to develop. It is the first step in a long and arduous process to develop the OCS's resources. The Court is unaware of any case that has dealt with this particular issue; however, it believes that considering the language of section 1349 and the purpose of OCSLA, this Court must exercise jurisdiction over this dispute. Likewise, the statute itself also contemplates a controversy which "involves rights" to OCS minerals. Certainly, the instant matter concerns such a controversy as generally an "operation" which involves the rights to minerals would be contractual in nature.

So, finding that the Court has jurisdiction, the Court must now determine whether this action should be dismissed in favor of the Texas action.

### Dismissal of the Declaratory Judgment Suit

As previously noted, the instant declaratory judgment suit was the first-filed suit concerning the dispute between British–Borneo and EEX concerning EEX's rights under the Agreement. The facts as described-above provide the following time-line:

| | |
|---|---|
| 10/1/97 | EEX informed British–Borneo of its belief that it has valid option to purchase the deep rights purchased by British–Borneo from Mobil in Green Canyon area.. |
| 10/97-4/98 | Intermittent discussions were had concerning settlement. |
| 4/8/98 | EEX sent letter to BBEI outlining claim of BBPI's breach of duty under ¶ 6 of Agreement; EEX stated that it expected to receive notice concerning the Mobil acquisition pursuant to the Agreement within "five working days from receipt of letter. "Failure to timely receive such notice will force EEX to pursue its legal remedies." |
| 4/20/98 | British Borneo responded by letter dated April 20, 1998 suggesting to attempt to resolve issues by arranging meeting between a vice-president of British–Borneo and a representative of EEX.<br><br>Apparently, additional negotiations occurred, but no agreement was reached. |
| 5/28/98 | Chief Executive of British–Borneo Petroleum Syndicate, P.L.C., wrote to Chief Operating Officer of EEX seeking to resolve the dispute amicably. The letter requested Mr. Henderson's "early comment." |
| 5/29/58 | Gaynor called Henderson. Gaynor's call was not returned. |
| 6/1/98 | British–Borneo filed the subject suit against EEX. British–Borneo did not serve EEX with a summons, complaint, or any other notice that an action had been initiated.[2] |
| 6/22/98 | EEX filed suit against BBEI in Harris County Texas seeking relief on the same contract issues involved in this action. |
| 6/24/98 | EEX served BBEI with its Texas petition. |
| 6/29/98 | BBEI served EEX in this action. |

**2.** (British–Borneo's Memorandum, Declaration of Steve Edrich, ¶¶ 11–16, Exhibits 2–4).

7/2/98     BBEI removed the Texas action to the United States District Court for the Southern District of Texas, Houston Division.

7/6/98     BBEI moved to dismiss the Texas action or transfer it to the Eastern District of Louisiana.

9/23/98    The Texas motion was denied without prejudice.

---

### The First–Filed Rule and a Complaint for Declaratory Judgment

▇ As the Southern District of Texas, Houston Division court noted, it is beyond peradventure that the Fifth Circuit generally follows the "first-to-file" rule in avoiding duplicative lawsuits filed in federal district courts. *Save Power Ltd. v. Syntek Finance Corp.*, 121 F.3d 947 (5th Cir.1997). This rule is based upon the consideration that:

> [t]he federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs. [citations omitted] ... The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result, [citations omitted] ...

*Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 917 (5th Cir.1997) (citing *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728–29 (5th Cir.1985)). Furthermore, the Fifth Circuit has instructed that not only does the first to file rule determine which court may decide the merits of substantially similar cases, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated. *Id.* at 920. However, "that rule is not adhered to where compelling circumstances dictate that the first action be dismissed rather than the second one." *Johnson Bros. Corp. v. International Brotherhood of Painters*, 861 F.Supp. 28, 29 (M.D.La.1994); *Stack v. Whitney National Bank*, 789 F.Supp. 753 (S.D.Miss.1991), *aff'd without op.*, 958 F.2d 1078 (5th Cir.1992).

▇ The jurisdiction of this Court has been seized through the filing of a complaint for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. The Act "has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of the litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). As such, it "is a procedural device designed to provide a new remedy to the federal court arsenal." *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 (5th Cir.1983). A court is not required to provide declaratory judgment relief, rather it is a matter for the district court's sound discretion. *Id.* Accordingly, " 'the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and the extent of federal judicial power.' " *Wilton*, 515 U.S. at 287, 115 S.Ct. at 2143.

▇ Various factors have been suggested and used by courts to determine to whether to hear a declaratory judgment action. These items include, but are not limited to:

(1) whether there is a pending state action in which all of the matters in controversy may be fully litigated: (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant; (3) whether the plaintiff engaged in forum shopping in bringing the suit; (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist; (5) whether the federal court is a convenient forum for the parties and witnessed; and (6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy.

*Travelers Ins. Co. v. Louisiana Farm Bureau Federation,* 996 F.2d 774, 778 (5th Cir. 1993) (citations omitted); *American Fidelity Ins. Co. v. Acadian Geophysical Serv., Inc.,* 1997 WL 786233 (E.D.La.1997) (Schwartz, J.). Reviewing these criteria, it is clear to the Court that this matter must be dismissed without prejudice.

With respect to the first factor, in the instant case, there is a parallel suit which was filed in state court, but removed to federal court in Houston. That case is for breach of contract and encompasses substantially identical issues as those before this Court.

Concerning the second, third and fourth factors, from the facts before the Court as described above, it is clear that the instant suit was filed in anticipation of suit being filed by EEX. EEX is the entity claiming that the terms of the Agreement between it and British–Borneo had been violated. EEX informed plaintiffs that it believed that plaintiffs had breached the Confidentiality Agreement in October of 1997. Negotiations were conducted to no avail; on April 8, 1998, EEX sent another letter threatening legal action. More negotiations were had; more letters and calls were exchanged. Only after EEX allegedly failed to return a phone call did British–Borneo file the instant suit, and then did not serve EEX with it until **after** EEX had filed its own suit in Texas state court.

Such machinations have been found to constitute a "rush to the courthouse" and grounds for the dismissal of a declaratory judgment suit. *See Mission Ins. Co. v. Puritan Fashions Corp.,* 706 F.2d 599, 602 (5th Cir.1983); *Service Corp. International v. Loewen Group Inc.,* 1996 WL 756808 (S.D.Tex. Nov.29, 1996); *Excel Music, Inc. v. Simone,* 1996 WL 5708 (E.D.La. Jan.5, 1996); *Johnson Bros. Corp. v. International Brotherhood of Painters,* 861 F.Supp. 28 (M.D.La. 1994) (court has little difficulty concluding case is preemptive strike where settlement negotiations were on going, declaratory judgment was filed, and service was withheld); *Stack v. Whitney National Bank,* 789

F.Supp. 753, 756 (S.D.Miss.1991); *909 Corp. v. Village of Bolingbrook Police Pension Fund,* 741 F.Supp. 1290 (S.D.Tex.1990). Indeed, the action as filed by British–Borneo reverses the roles of the parties. The aggrieved party here is EEX, not British–Borneo.

Courts have noted that that the party filing suit in anticipation of a suit in another forum should not be rewarded for what amounts to forum shopping. *Simone,* 1996 WL 5708 at 6. Put another way, "[t]he Court cannot allow a party to secure a more favorable forum by filing an action for declaratory judgment when it has notice that the other party intends to file suit involving the same issues in a different forum." *909 Corp.,* 741 F.Supp. 1290. Furthermore, application of the first-filed rule in this instance where there were on-going settlement negotiations, penalizes EEX for its attempt to make a good faith effort to settle out of court. In addition, anticipatory suits deprive a potential plaintiff of his choice of forum. *Id.* at 1298. As stated in *909 Corp.,* " 'the wholesome purposes of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum.' " *Id.* (quoting *New Orleans Public Serv. Inc. v. Majoue,* 802 F.2d 166, 168 (5th Cir.1986)) (quoting *H.J. Heinz Co. v. Owens,* 189 F.2d 505, 508 (9th Cir.1951)).

Concerning the fifth and sixth factors, from the pleadings and evidence before the Court, it appears that in reality, Texas would provide the more convenient forum. Most of the attached exhibits and affidavits appear to come out of Texas—either Houston or Dallas. Both companies are Texas corporations. The Agreement contains a Texas choice of law provision.[3] Finally, retaining this lawsuit would not serve the purposes of judicial economy.

Accordingly, for all of the reasons stated above,

**IT IS ORDERED** that the Motion to Dismiss is **GRANTED** without prejudice.

---

**3.** The Court would note that as it has found that there is OCSLA jurisdiction, this provision may not be enforceable; however, the Court will not rule on this issue as it is not before it. *See Tidelands Royalty "B" Corp. v. Gulf Oil Corp.,* 804 F.2d 1344 (5th Cir.1986).

## JUDGMENT

Considering the foregoing reasons entered,

**IT IS ORDERED, ADJUDGED AND DECREED** that there be judgment in favor of EEX Corporation, individually and as successor in interest to Enserch Exploration, Inc. and against British–Borneo Exploration, Inc. and British–Borneo Petroleum, Inc. dismissing this case without prejudice.